# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ANTS TOMSON,

        **Plaintiff,**

**v.**

                                        **Case No: 6:18-cv-1719-Orl-28GJK**

**MINNESOTA LIFE INSURANCE
COMPANY,**

        **Defendant.**

## ORDER

After Plaintiff Ants Tomson lost the vision in his right eye in 2017, he submitted claims to Defendant Minnesota Life Insurance Company for benefits under two substantially identical Accidental Death and Dismemberment (AD&D) insurance policies. When Minnesota Life denied those claims, Tomson filed this suit alleging breach of contract.[1] (Compl., Doc.1-1).

Minnesota Life has filed a Motion for Summary Judgment (Doc. 30)[2] in which it argues that Tomson's loss is 1) not covered because something other than an accident caused or contributed to it; 2) excluded from coverage as a loss to which "bodily or mental infirmity, illness or disease" contributed; and 3) excluded from coverage because it was the result of "medical or surgical treatment or diagnostic procedures or related complications." Because Minnesota Life properly denied coverage under the policies' exclusions for

---

[1] Tomson filed two lawsuits—one under each AD&D policy—in state court, and Minnesota Life removed both cases to this Court based on the parties' diverse citizenship. (Notice of Removal, Doc. 1). The second case—Case No. 6:18-cv-1723-Orl-28-GJK—was consolidated with this case, with all filings made in this case after consolidation. (Order, Doc. 13). This Order disposes of both cases.

[2] Tomson filed a Response (Doc. 44) and Minnesota Life filed a Reply (Doc. 46).

"medical or surgical treatment or diagnostic procedures or related complications," the motion is granted.

## I.   Background

On July 12, 2017, Tomson, an octogenarian, consulted an orthopedic surgeon because of persistent right knee pain.  (Mead Dep., Doc. 30-5, at 7[3]).  The surgeon concluded that Tomson's knee was arthritic and discussed treatment options with him.  (Id. at 7–10).  Tomson elected to have knee replacement surgery and scheduled the surgery for August 8, 2017.  (Id. at 10; Tomson Dep., Doc. 30-6, at 17).  In preparation for the surgery, the surgeon prescribed several medications, including a test dose of hydromorphone—an opioid medication that he planned to use to alleviate Tomson's post-surgical pain.  (Mead Dep. at 25, 27).  In his deposition, the surgeon stated:

> At that time, we were frequently placing patients on trial test doses of medication that we were going to use after the operative procedure.  The purpose for that was a lot of people are intolerant of certain narcotics and tolerant of others.  It's far preferable to have someone, if they're going to throw up from a pain medication, which is not uncommon, to do it ahead of time so we don't have to fish around for a different type of medication while they're in the hospital actively vomiting.

(Id. at 25).

On Wednesday, August 2, 2017, Tomson took the first test dose of hydromorphone at around 5:30 p.m.  (Tomson Dep. at 17; Preliminary Report, Doc. 30-5 at 57).  About an hour later, he began vomiting blood.  (Tomson Dep. at 17).  When Tomson woke up the next morning, he again vomited blood before passing out on the floor of his bedroom.  (Id. at 17–18).  He was taken by ambulance to the hospital and continued to vomit blood.  (Id.

---

[3] Citations to deposition page numbers are to the pages of the depositions themselves and not necessarily to electronic record page numbers.

2

at 18). There, Tomson was diagnosed as having "[n]arcotic-induced nausea and vomiting" and was discharged later that day. (Emergency Room Report, Doc. 30-9 at 3; Tomson Dep. at 18).

By the day after his emergency room visit, Tomson's vision in his right eye was blurry, (Tomson Dep. at 19), and the day after that—Friday, August 4—Tomson was unable to see with his right eye, (id. at 18). His wife scheduled an appointment for him with his regular eye doctor for Monday, August 7, 2017. (Id. at 18, 25). When Tomson arrived at the August 7 appointment, he fainted, hit his head on the ground, and was again taken by ambulance to the hospital. (Id. at 19–20). Emergency room records reflect that Tomson had a closed head injury, syncope (passing out), a gastrointestinal bleed, and "acute blood loss anemia." (Doc. 30-5 at 76; Emergency Room Final Summary, Doc. 30-4, at 1).

Several medical specialists, including an ophthalmologist, examined Tomson before he was released from the hospital on August 11, 2017. The ophthalmologist determined that Tomson suffered from ischemic optic neuropathy—a type of damage to the optic nerve that can be caused by blood loss or lack of oxygen in the blood. (Ginsberg Dep., Doc. 30-13, at 13–15). The doctor was unaware of Tomson's anemia at the time. (Id. at 19).

After his discharge from the hospital, Tomson followed up with the ophthalmologist, who referred Tomson to a neuro-ophthalmologist to identify the cause of Tomson's vision loss. (Id. at 6). The neuro-ophthalmologist confirmed the ischemic optic neuropathy diagnosis and assumed—based on the appearance of the optic nerve, visual field testing, and a limited patient history stating that Tomson had recently suffered a loss of blood and anemia—that the ischemia was caused by blood loss and anemia. (Aouchiche Dep., Doc. 30-14, at 23–24, 31, 48–50). He found no bruising, bleeding, or other evidence that the

3

trauma from Tomson's falls caused the vision loss.  (Id. at 36).  The doctor concluded that Tomson's optic neuropathy is untreatable.  (Id. at 43–44).

Sometime prior to these events, Tomson had obtained two AD&D policies from Minnesota Life, and on August 23, 2017, he sent a letter to Minnesota Life giving notice of claims under those policies for loss of vision due to multiple falls.  (Ex. 1 to Tomson Dep., Doc. 30-6 at 114–15).  And on October 30, 2017, Tomson submitted a Notice of Accidental Loss of Sight Claim form and supporting documents.  (Ex. 3 to Tomson Dep., Doc. 30-6 at 118–43).

On January 9, 2018, Minnesota Life denied Tomson's claims, determining that there was no evidence that the falls caused the loss of vision. (Ex.10 to Tomson Dep., Doc. 30-6 at 191–92).  Minnesota Life also concluded that the records showed that the vision loss was due to anemia and blood loss, which was not a direct result of an accidental injury but instead "was caused by, or there was contribution from[,] bodily or mental infirmity, illness or disease"—a policy exclusion.  (Id. at 192).

Tomson appealed the denial of benefits to Minnesota Life by letter dated January 18, 2018, submitting, along with supplementary medical records and other documentation, a new description of the events leading to his vision loss that included the hydromorphone and the vomiting.  (Ex. 8 to Tomson Dep., Doc. 30-6 at 175–84).  On March 22, 2018, Minnesota Life affirmed its denial of Tomson's claim, noting that even if his vision loss was caused by the test dose of hydromorphone, it was nevertheless barred under the exclusion for "medical or surgical treatment or diagnostic procedures or any resulting complications." (Letter, Doc. 30-20).  Tomson then filed the instant action, and Minnesota Life now seeks summary judgment.

## II.   Legal Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court must construe the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

## III.   Discussion

Although Tomson initially relied on the falls as the basis for his vision loss, he now acknowledges that the medical records do not support that theory.  At this point, the parties agree that—as opined by all of the doctors—Tomson's vision loss resulted not from trauma to his head but from ischemic optic neuropathy.  But they still disagree as to whether the loss is covered by the AD&D policies.  Minnesota Life's arguments for summary judgment are addressed in turn.

### A.   Accidental Injury

Minnesota Life's policies provide that benefits will be paid only when the loss results "directly," and "independently . . . from all other causes, from an accidental bodily injury which was unintended, unexpected and unforeseen." (Doc. 30-2 at 2).  Minnesota Life first argues that there is no genuine dispute that something other than an accident caused, or contributed to, Tomson's loss of vision; thus, it maintains that the loss is not a "covered loss" under its policies.  The Court is not persuaded.

Minnesota Life contends that because all of the doctors agree that Tomson's ischemic optic neuropathy was caused by blood loss and anemia rather than by trauma from Tomson's fainting spells, the vision loss was not the result of an accident.  But Tomson

5

presents his causation theory in these terms:  that he took hydromorphone; it caused him to vomit blood; and the blood loss caused his ischemic optic neuropathy, resulting in vision loss.  This sequence of events is the same as what Tomson initially presented to Minnesota Life in his pre-suit claim notice except that it deletes reference to injury from the fall causing his vision loss.  In its Reply, Minnesota Life does not argue that Tomson's alleged sequence of events would not constitute an accident; it merely argues that Tomson did not present evidence creating a genuine issue of fact as to whether hydromorphone triggered the chain of events.

The Court disagrees.  There is evidence in the record creating a genuine issue of fact as to whether the hydromorphone caused Tomson's blood loss and anemia.  Although there is no evidence other than Tomson's own testimony that explicitly states that the hydromorphone caused Tomson to vomit blood, the medical records do reflect that Tomson's hemoglobin levels dropped drastically after he took the hydromorphone and began vomiting.  No medical record or testimony explicitly states that any doctor believes there is another cause of the blood loss and anemia.  Further, some doctors seem to accept that the medication could have been the cause by mentioning in the medical notes Tomson's statement that he took hydromorphone before beginning to vomit and then listing findings and diagnoses without explaining an alternative rationale.

There is an issue of fact as to whether the hydromorphone led to the vision loss, and the Court will not grant summary judgment based on Minnesota Life's argument that Tomson did not suffer an accidental injury.

## B.    Exclusions

Minnesota Life's second argument is that even if the hydromorphone did cause

Tomson's vision loss, two policy exclusions apply to bar coverage.  Although the Court does not agree with Minnesota Life as to the applicability of the first exclusion, it does agree that the second exclusion addressed below applies and entitles Minnesota Life to summary judgment.

       1.     *"bodily or mental infirmity, illness or disease"*

Minnesota Life's AD&D policies contain an exclusion that states:  "In no event will we pay a benefit where your loss or injury is caused directly or indirectly by, results from, or there is contribution from . . . bodily or mental infirmity, illness or disease."  (Doc. 30-2 at 3).  "[W]here an accident policy contains, as it does here, both a condition that the injuries sustained in the accident result independently of all other causes and an exclusion for injuries caused directly or indirectly by a bodily or mental infirmity, the insurer will generally be entitled to judgment as a matter of law where the undisputed facts show that the preexisting infirmity contributed to the [loss]."  Buck v. Gulf Life Ins. Co., 548 So. 2d 715, 717 (Fla. 4th DCA 1989) (emphasis removed).

Minnesota Life argues that this exclusion applies because the undisputed evidence shows that Tomson's anemia caused or contributed to the loss of vision.  But the cases that Minnesota Life cites in support of this argument all discuss *preexisting* conditions triggering similar exclusions, not conditions caused by the alleged accident.  See Buck, 548 So. 2d at 716 (preexisting alcoholism and related infirmities);  Berg v. N.Y. Life Ins. Co., 88 So. 2d 915, 917 (Fla. 1956) (preexisting arteriosclerosis contributed to death after robbery);  Joseph v. Hartford Life & Accident Ins. Co., Case No. 09-22331-Civ-Martinez-Brown, 2010 U.S. Dist. LEXIS 151789, at *3–5 (S.D. Fla. Mar. 17, 2010) (preexisting diabetes contributed to spread of infection);  see also 10 Couch on Ins. § 141:25 (3d ed.

Dec. 2019 update) ("[D]iseases or conditions themselves attributable to the accident do not fall within an exclusionary provision for loss caused by disease or the like, since these conditions are the direct result of the accident.").  Here, it is far from clear that Tomson's anemia was preexisting rather than caused by the chain of events started by the hydromorphone; Tomson maintains that the hydromorphone caused him to vomit blood, that the blood loss then caused anemia, and the anemia then caused the ischemic optic neuropathy.

Although Minnesota Life focuses on anemia, Minnesota Life has not established that the anemia was a preexisting condition or otherwise arose independently of the hydromorphone.  Tomson's hemoglobin level dropped from 13.5 on August 1 to 11.1 on August 3 and to 6.1 on August 7. (Doc. 30-5 at 77; Doc. 44-1 at 2).  Minnesota Life's own medical expert acknowledges that the Tomson's anemia was "acutely acquired," (Kay Dep., Doc. 30-11, at 35–36), and he did not make a determination as to how Tomson's hemoglobin level dropped, (id. at 39).  And the ophthalmologist did not know that Tomson was anemic when he treated him for the vision loss. (Ginsberg Dep. at 19).

And as previously noted, the other hospital records, physician testimony, and other documentation do not establish whether the anemia arose independent of the hydromorphone.  Although Minnesota Life asserts in its Reply that Tomson's anticoagulation medication, Plavix, contributed to the loss because it increased his risk of developing anemia, there is nothing in the record establishing that Plavix contributed to the loss.[4]  Tomson's orthopedic surgeon merely testified that he recommended that Tomson

_____

[4] Minnesota Life mentioned Plavix briefly in its motion, but it did not argue it as a contributing factor until its reply.  Because the Court does not find evidentiary support for the argument, it will not address whether the argument was properly presented.

stop taking Plavix prior to surgery to avoid the risk of excess bleeding during surgery.

Minnesota Life has not established that any "bodily . . . infirmity, illness or disease" caused or contributed to the loss.  Thus, Minnesota Life's argument for summary judgment in its favor based on this exclusion is rejected.

> 2.    *"medical or surgical treatment or diagnostic procedures or any resulting complications"*

The AD&D policies at issue also contain an exclusion that states: "In no event will we pay a benefit where your loss or injury is caused directly or indirectly by, results from, or there is contribution from . . . medical or surgical treatment or diagnostic procedures or any resulting complications." (Doc. 30-2 at 3).  Minnesota Life contends that even under Tomson's theory of the case, the loss is excluded because the test dose of hydromorphone was a "diagnostic procedure" and "medical or surgical treatment."  The Court agrees. Based on this exclusion, Minnesota Life is entitled to summary judgment in its favor.

### a.    Diagnostic Procedure

First, the test dose of hydromorphone was a "diagnostic procedure."  The orthopedic surgeon testified in his deposition: "At that time, we were frequently placing patients on trial test doses of medication that we were going to use after the operative procedure.  The purpose for that was a lot of people are intolerant of certain narcotics and tolerant of others." (Mead Dep. at 25).  In other words, the surgeon prescribed the test dose in order to diagnose a narcotic intolerance.

Tomson notes that when the surgeon was asked in his deposition whether he would consider the test dose a diagnostic procedure, he said, "No." (See Mead Dep. at 34).  But the surgeon's characterization is not dispositive on this point, and his description clearly showed that he was attempting to diagnose narcotic intolerance and the process that he

was using to assess the issue—administration of a test dose.  The surgeon's explanation fits within the definition of "diagnostic procedure" that Tomson himself provided in his Response: "a 'procedure followed in making a medical diagnosis.'"  (See Doc. 44 at 19 (quoting TheFreeDictionary.com)).  Tomson also argues, without citation to any authority, that the test dose was a "diagnostic test," which he claims is different from a "diagnostic procedure" and should not be construed as within this exclusion.  The term "diagnostic," as used in "diagnostic test," is defined as: "using the methods of or yielding a diagnosis." Diagnostic, https://www.merriam-webster.com/dictionary/diagnostic (last visited June 8, 2020).  This definition is effectively identical to Tomson's cited definition of "diagnostic procedure."  Tomson's assertions against applying the diagnostic procedure exclusion are unavailing.

Although insurance policy exclusions generally "are to be restrictively read," this principle "is of course tempered by the rule of reason and the principle that even insurance policies must be given practical, sensible interpretations in accordance with the natural meaning of the words employed."  Simmons v. Provident Mut. Life Ins. Co. of Phila., Pa., 496 So. 2d 243, 245 (Fla. 3d DCA 1986).  In this case, the test dose of hydromorphone falls within a practical interpretation of the policy's exclusion for "diagnostic procedures," and Minnesota Life is entitled to summary judgment in its favor based on this exclusion.

### b.    Medical or Surgical Treatment

The hydromorphone test dose was also a "medical or surgical treatment" under this exclusionary clause.  In preparation to cure Tomson's ailment, the surgeon found it necessary to determine whether Tomson suffered from an intolerance to the necessary

post-operative pain medication.[5]  Under Florida law, such steps in preparation for surgery and recovery generally fall within the meaning of "treatment."  See Simmons, 496 So. 2d at 245 ("The treatment may, and generally does, include three stages: Preliminary, main, and final.  Whatever is usually done to the patient or administered to him by a skilled physician or surgeon in any one of these stages is properly included under the term treatment, even though it may not be an indispensable prerequisite." (internal quotation marks omitted) (quoting Provident Life & Accident Ins. Co. v. Hutson, 305 S.W.2d 837, 840 (Tex. Civ. App. 1957)).[6]  Diagnostic and preparatory steps are appropriately considered "treatment" because they are part of the physician's overall treatment of the ailment.  See id. ("Within [the] legal meaning must be included not only what the physician or surgeon views as treatment, that is, things done in an effort to relieve or cure a physical disease or infirmity, but also all of the things performed by a doctor or a surgeon on the body of the patient in the diagnosis of or in preparation for cure." (alteration in original) (quoting Hutson, 305 S.W. 2d at 840)).

Here, the treating surgeon prescribed the test dose of hydromorphone as part of his treatment plan to remedy Tomson's knee pain.  Thus, even accepting Tomson's argument that the hydromorphone caused his vision loss, that cause was "medical or surgical treatment."  Thus, this portion of this exclusion also warrants summary judgment in favor of Minnesota Life.

---

[5] Minnesota Life's motion alternatively argues that Tomson was prescribed the pain medication to treat his pre-surgery pain.  There is no evidence of this in the surgeon's deposition or the medical records.

[6] See also 10 Couch on Ins. § 141.91 (3d ed. Dec. 2019 update).

## IV.     Conclusion

Accordingly, it is **ORDERED** and **ADJDUGED** as follows:

1.      Defendant's Motion for Summary Judgment (Doc. 30) is **GRANTED**.

2.      All other pending motions are **DENIED as moot**.

3.      The Clerk is directed to enter a judgment providing that Plaintiff Ants Tomson takes nothing on his claims against Defendant Minnesota Life Insurance Company.

4.      After entry of judgment, Clerk shall close both this case and Case No. 6:18-cv-1723-Orl-28GJK.

**DONE** and **ORDERED** in Orlando, Florida, on July 1ˢᵗ, 2020.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

12